## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**PHILLIP Y. MO**                                   **CIVIL ACTION**

**VERSUS**                                          **NO. 04-3108**

**EXXON MOBIL CORPORATION**                         **SECTION  "K" (3)**
                                                    **28 U.S.C. § 636(c)**

### ORDER AND REASONS

This case is before the undersigned Magistrate Judge pursuant to the parties' 28 U.S.C.

§636(c) consent.[1]  Before the Court is Defendant's Motion for Summary Judgment [Doc. # 52]

and Motion in Limine to Strike Expert Witnesses and Evidence [Doc. # 60] .  Plaintiff opposed

both motions,[2] defendant filed supplemental response memoranda.[3]  The matter was the subject

of an oral hearing on July 26, 2006; thereafter, defendant's motions were taken under

───────────────────

[1]*See* Consent to Proceed before a United States Magistrate Judge dated June 15, 2005
[Rec. Doc. No. 10].

[2]*See* Plaintiff's Memoranda in Opposition to Defendant's Motions in Limine and for
Summary Judgment [Rec. Doc. Nos. 67 and 68].

[3]*See* Exxon Mobil Corporation's Supplemental Memorandum Addressing the Supreme
Court's June 22, 2006 Decision in *Burlington Northern & Santa Fe Railway Co. v. White* filed
July 11, 2006 [Rec. Doc. No. 66]; Exxon Mobil Corporation's Reply to Plaintiff's Opposition to
Motion for Summary Judgment [Rec. Doc. No. 71].

advisement. This case is set for a bench trial on September 25, 2006,[4] the discovery deadline has expired and the case is ripe for disposition, either by summary judgment or pursuant to trial.  For the following reasons, the Court GRANTS defendant's Motion for Summary Judgment [Rec. Doc. No. 52] and dismisses defendant's Motion in Limine [Rec. Doc. No. 60] as MOOT.

## UNDISPUTED PROCEDURAL AND FACTUAL BACKGROUND[5]

On November 15, 2004, plaintiff Phillip Y. Mo ("Mo"), filed the captioned case against his former employer ExxonMobil Corporation (ExxonMobil), alleging harassment/hostile environment) on the basis of race (Asian) and national origin (Burmese), discriminatory failure to promote and retaliation under Title VII.  He further alleged intentional infliction of emotional distress (IIED) under Louisiana law, as well as age and disability discrimination under the ADEA and ADA, respectively.   Plaintiff's claims of disability and age discrimination were dismissed with prejudice.[6]  The defendant filed the subject motion for summary judgment addressing

---

[4]*See* Minute Entry dated March 8, 2006 (continuing the bench trial to September 25, 2006 and resetting all pretrial deadlines) [Rec. Doc. No. 49].

[5]"ExxonMobil Corporation's Statement of Material Facts" [Rec. Doc. No. 52-19] filed pursuant to Local Rule 56.1 is adopted by reference and incorporated as if reiterated *in extenso*. Local Rule 56.2 provides: "Each copy of the papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which there exists a genuine issue to be tried.  All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Local Rule 56.2.  This Court's review of summary judgment record, which is legion, reveals that the *material* facts set forth in defendant's statement are uncontroverted and they are, in any event, deemed admitted since the plaintiff has failed to controvert same as required by Local Rule 56.2.  Even considering plaintiff's argument and submissions in opposition to the motion for summary judgment, he fails to establish any *material* facts which are disputed with competent summary judgment evidence.

[6]*See* Order dated July 25, 2005 (voluntary dismissal of ADA claim)[Rec. Doc. No.12]; Minute Entry dated January 31, 2006 (granting defendant's unopposed motion to dismiss purported claims of age discrimination) [Rec. Doc. No. 24].

plaintiff's remaining claims, to wit: (1) race-based (Asian) and national origin-based (Burmese) discrimination (*i.e.*, hostile work environment and failure to promote) under Title VII; (2) retaliation under Title VII; and (2) intentional infliction of emotional distress under Louisiana law.

It is undisputed that Mo worked at defendant's Chalmette, Louisiana refinery from April 1, 1992 until March 1, 2006, when he was separated from employment for medical reasons.[7] Plaintiff was employed as an operator trainee and operator by Mobil Oil Corporation from April 1, 1992 to February 1, 2002.  On February 1, 2002, he became employed as an operator by ExxonMobil, following a merger between Exxon Corporation and Mobil.  Mo last actively worked at the Refinery on October 5, 2005.  He was placed on disability pay effective October 15, 2005 and never returned to work.  Plaintiff was separated from employment for medical reasons on March 1, 2006.

Mo complains of discriminatory conduct while he worked in the Hydrocracker and Coker units of the Chalmette refinery.  Between 1992 and June of  1996 and between October of 1996 and June of 2001, plaintiff worked in the Hydrocracker unit; between June of 1996 and October of 1996, he worked Coker No. 2 in the Coker unit.  The Hydrocracker and Coker units are located in separate areas of the refinery away from the Aromatics Complex, where plaintiff was assigned to work in June of 2001.[8]

---

[7]*See* Plaintiff's Memorandum in Opposition at p. 1 [Rec. Doc. No. 68]; Defendant's Statement of Undisputed Facts at Item 3 [Rec. Doc. No. 52-19].

[8]*See* Defendant's Statement of Undisputed Facts at Item Nos. 7-9.

While assigned to the Hydrocracker and Coker units, plaintiff was subjected to harassment on the basis of his race and national origin.[9]  The defendant responded to Mo's complaints and attempts were made by the company to remediate the problems.[10]

Mo did not file an EEOC complaint in connection with the defendant's alleged discriminatory or retaliatory conduct while plaintiff was employed in the Hydrocracker unit (Region 4) and Coker unit (Region5).  Indeed, more than two and a half  years elapsed, after plaintiff 's reassignment to the Aromatics Complex in June of 2001, before he filed his first EEOC charge naming the defendant as respondent.[11]  In this regard, plaintiff  candidly admitted that he did not file either an EEOC charge within 300 days of leaving the Hydrocracker unit to address his allegations of harassment, *all of which occurred while assigned to the Hydrocracker and/or Coker units.*[12]  It is undisputed that once assigned to the Aromatics Complex in June of 2001, he had different co-workers and supervisors.[13]  Mo further testified that (1) Regional

---

[9]*See* Sealed Declaration of Mark Bowen, Senior Human Resources Advisor/Specialist, dated June 13, 2006 and attachments.

[10]*Id.*

[11]*See* Defendant's Statement of Undisputed Facts at Item No. 2[Rec. Doc. No. 52-19]; EEOC Charge No. 270-2004-00814 filed February 10, 2004 (alleging a pattern of continual harassment on race, national origin and age discrimination for the period of April 1, 2002 through December 11, 2003 and failure to promote to a temporary supervisor position in violation of Title VII) [attached as Mo "1" to Plaintiff's Sealed Deposition of January 25, 2006/Vol. I]; EEOC Charge No. 270-2004-01558 filed April 30, 2004 (alleging disability discrimination and retaliation for filing the February 10, 2004 EEOC complaint) amended on May 5, 2004 (alleging the two-day suspension for scuffling with Charles Washington also constituted retaliation for his prior EEOC complaint)[attached as Mo "3" and "3A" to Plaintiff's Sealed Deposition of January 25, 2006/Vol. I].

[12]*See* Sealed Deposition of Phillip Mo., at Vol. 1, p. 246.

[13]*See id.*, at Vol. 1, pp. 65-67 (Plaintiff testified that, in Aromatics, he no longer worked with people in Hydrocracker and Coker; he had new coworkers, new supervisors and a new

4

Business Supervisor Kevin Burke came to the Aromatics Complex about the same time as plaintiff, (2) they had a good working relationship and (3) plaintiff also had a good relationship with everyone in Aromatics.[14]   Plaintiff admitted that he was not exposed to any harassment based upon his race or national origin while assigned to the Aromatics Complex.[15]

Burke let the workers in the Aromatics Complex know that he was looking to assign an employee to the Temporary Shift Foreman (TSF) Program to train for the position of Process Team Leader (PTL).  It is undisputed that a TSF candidate must consistently display the competencies and behavior expected of a supervisor and must be a "team player."  The PTL's job responsibilities include working the computer console, the safe, environmentally sound and economic operation of the units/complex for which he is responsible and working with Field Supervisors to direct/supervise the activities of the operators. In June of 2003, for various reasons including that Mo failed to consistently exhibit the behavior/attributes of a supervisor and team player, Burke made the decision not to place Mo in the TSF program.  Because Burke believed that no one in the Aromatics Complex was suitable for the temporary PTL position, Burke sought recommendations from outside of the complex and eventually hired Douglas Tillman, who was recommended by management-level employees and was qualified for the assignment.[16]

---

complex).

[14]*See id.,* at Vol. I, pp. 70, 97-98 and 100 (stating that he got along with everybody in that unit, including Mr. Burke, and that he never heard Burke say anything derogatory about plaintiff's race or national origin).

[15]*See* Sealed Deposition of Phillip Mo, Vol. II, at p. 50.

[16]*See* Sealed Declaration of Kevin Burke, at ¶¶ 7-14 (noting that on June 25, 2003, he explained to Mo why he was not selected to participate in the training (TSF) program as a temporary PTL); Defendant's Statement of Undisputed Facts, at ¶¶ 12-17.

On December 11, 2003, Plaintiff had an altercation/scuffle with an African-American operator named Charlie Washington.  The altercation had nothing to do with Mo's race or national origin and he never accused Washington of harassment based on race or national origin.  Plaintiff  testified in deposition that he does not know what motivated Washington's alleged aggression.  In Aromatics, plaintiff had a few other disagreements with Washington which had nothing to do with race or national origin, to wit: (1) a disagreement over the timing of catching samples; and (2) Washington cursed him.  Plaintiff  testified that he believed the problem started when Mo failed to call Washington to breakfast on one occasion.  Mo indicated that  Washington was angry about the breakfast incident and possibly held a grudge.[17]

With regard to the December 11, 2003 altercation, it is undisputed that both Mo and Washington were given the same discipline – a two-day suspension without pay.  Upper management (Curtis Fullard - HR/African American, Boyd Barrilleax -Process Manager/Caucasian and Dan Zivney- Process Manager/Caucasian) concluded that both employees should receive the same discipline because there were no witnesses to the physical altercation, it was one worker's word against the other's and the company had a strict policy against fighting.[18]  On December 16, 2003, Washington reported back to the Refinery and

---

[17]*See* Sealed Deposition of Phillip Mo, Vol. II, at pp. 10-19 (stating that Washington was angry because he wanted to be called about breakfast and maybe he held a grudge but that he never made derogatory statements based on race or national origin).

[18]*See* Sealed Declaration of Kevin Burke dated June 12, 2006 (noting that (1) it was his and Seals' opinion that Mo provoked the incident recommendation that Mo receive a 3-day suspension and Washington receive a written warning, (2) upper management disagreed and imposed the same discipline on both and (3) Mo did not return to work until May 3, 2004 when he finally received the two-day suspension meted out to plaintiff  and coworker Washington following the investigation of the December 11, 2003 altercation) and Exh. "B-3" *dated December 11, 2003* (recommending a 3-day suspension in the case of Mo and a written warning in the case of Washington).

received his two-day suspension.[19]  It is undisputed that Mo did not report back to work in December of 2003.  Mo did not return until May 3, 2004, at which point in time he was notified of the December, 2003 decision and suspended for two days.[20]

In March of 2004, Burke hired Roger Patton (Caucasian) and Edward Carrell (Caucasian) from outside of the facility to directly fill  PTL positions because they were qualified for that position.  In this regard, Burke attested that he was informed that other complexes needed all of their operators and could not afford to give any up to train as temporary PTLs.  Burke explained that the temporary PTL/TSF program was not for "outside hires."  He further explained that Mo was not considered for assignment to the TSF program/temporary PTL in 2004, because he continued to exhibit conduct/behavior incompatible with the attributes of Process Team Leader, *i.e.*, the incident with Charles Washington discussed above.   As aforestated, both Patton and Carrell were qualified for the PTL position in that they had the requisite motivation, interpersonal skills,  technical knowledge/ experience, supervisory ability and Honeywell TDC-3000 board experience.[21]

## SUMMARY JUDGMENT STANDARD

The principal purpose of Fed. R. Civ. P. 56 is to "isolate and dispose" of factually unsupported claims.[22]   Summary judgment is proper where "the pleadings, depositions, answers

---

[19] *See id.* and Exhibit "B4" to Burke's Declaration.

[20] *See id.* and Exhibit "C1" to Burke's Declaration.

[21] *See id.* at ¶¶ 13-14 and Exh. "A1" (PTL Position Description).

[22] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact...."[23]   There is no "genuine issue" when the record taken as a whole could not lead a rational trier of fact to find for the nonmovant.[24]

Summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[25]   A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.[26] "In such a situation, there can be 'no genuine issue of material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[27]

The Court has no duty to search the record for triable issues.[28]  Mere assertions of a factual

---

[23]Fed. R. Civ. P. 56(c).

[24]*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

[25]*Celotex*, 477 U.S. at 323.

[26]*Nebraska v. Wyoming,* 507 U.S. 584, 590 (1993); *Celotex,* 477 U.S. at 323; *Wenner v. Texas Lottery Commission,* 123 F.3d 321, 324 (5th Cir.), *cert. denied,* 523 U.S. 1073 (1998).

[27]*Celotex,* 477 U.S. at 322-23.

[28]*Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

dispute unsupported by probative evidence will not prevent summary judgment.[29]   "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim."[30]   Conclusory statements, speculation and unsubstantiated assertions are not competent summary judgment evidence and will not suffice to defeat a properly supported motion for summary judgment.[31] "Summary judgment is appropriate in any case 'where critical evidence is so weak or tenuous on an essential fact' that it could not support a judgment in favor of the nonmovant."[32]

## DISCUSSION

### I . Prescription: Title VII Discrimination Claims

At the outset, the Court notes that on a motion for summary judgment it is constrained to take the plaintiff at his uncontroverted word – *i.e.*, harassment based on race and national origin ended once the plaintiff was transferred to the Aromatics Complex in June of 2001.   For that reason, plaintiff's claims Title VII harassment/hostile environment claims are not actionable.

As a prerequisite to filing a Title VII claim in federal court, the complainant must: (1)

---

[29]*Celotex,* 477 U.S. at 248-50;  *Abbot v. Equity Group, Inc.,* 2 F.3d 613, 619 (5th Cir. 1993).

[30]*Ragas*, 136 F.3d at 458 (emphasis added).

[31]*Id.*; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir. 1996).

[32]*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075-76 (5th Cir. 1994) (*citing  Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir. 1993)); *see also Read v. BT Alex Brown*, 2003 WL 21754966 * 2 (5th Cir.), *cert. denied*, 2004 WL 323271 (U.S. February 23, 2004).

timely file suit as required by Title VII and (2) have first exhausted his administrative remedies.[33] Failure to meet these requirements bars the plaintiff from later pursuing his claims before the EEOC or in federal court.[34]

A Title VII plaintiff must file a charge of discrimination with the EEOC no more than 180 days after the alleged discriminatory employment activity occurred.[35]   However, in "deferral states," this period is extended to 300 days if the complainant has instituted a complaint with a state or local agency with authority to grant or seek relief with respect to such practices. Louisiana is a deferral state; therefore, the 300 day filing period applies.[36]  The time to file a claim for discrimination with the EEOC "begins to run from the time the complainant knows or reasonably should have known that the challenged act has occurred."[37]   Once the clock begins to run, the complainant has 300 days to file a charge of discrimination with the EEOC.[38]  The complainant then has 90 days from the issuance of a Right-to-Sue Letter by the EEOC to file

---

[33]*Tolbert v. U.S.*, 916 F.2d 245, 247-48 (5th Cir.1990)( *per curiam* ); *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 711 (5th Cir.1994).

[34]*See Aronzon v. Southwest Airlines*, 2004 WL 57079 (E. D. La. Jan.9, 2004) (Vance, J.) (Because there was no evidence that plaintiff filed a charge with the EEOC or an appropriate state agency, plaintiff failed to exhaust his administrative remedies and his claims were time-barred from later pursuing such remedies before the EEOC or in federal court).

[35]42 U.S.C. § 2000e-5(e)(1).

[36]LSA-R.S. § 23:303; *Mayes v. Office Depot, Inc.*, 292 F. Supp. 2d 878, 888 (W. D. La.2003).

[37]*Id.* (*quoting Huckabay v. Moore*, 142 F.3d 233, 240 (5th Cir.1998))

[38]*Id.* (*citing Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir.2001).

10

suit.[39]

Plaintiff does not dispute that he did not file an EEOC complaint alleging harassment until February 10, 2004; his opposition to the defendant's prescription argument is predicated on the application of the  "continuing violation theory" as enunciated by the Fifth Circuit in *Waltman v. International Paper Co.*, 875 F.2d 468, 474 (5 Cir.1989).   The exception arises "where the unlawful employment practice manifests itself over time, rather than in discrete acts."[40]   Three factors that support a continuing violation claim are: subject matter, frequency and degree of permanence.[41]   To support his allegation of a "continuing violation," plaintiff contends that he has consistently been the victim of race and national discrimination throughout the entire time he was employed by the defendant and that he was repeatedly denied training for and promotion to supervisory positions.

The law of the Fifth Circuit supports defendant's position that Mo cannot resurrect his time-barred harassment/hostile work environment claim and/or failure to promote claims through the application of the continuing violation doctrine.  It is undisputed that the harassment and hostile work environment abated upon plaintiff's reassignment to the Aromatics unit.  As to failure to promote, such claims are based upon discrete acts.  Aside from Burke's allegedly discriminatory decision of July of 2003 (*i.e.*,  not to assign Mo to the TSF program/temporary PTL), plaintiff's claims in this regard are untimely.[42]

_____

[39]*Mayer v. Southeast Battery*, 2001 WL 1352321 at *1 (E.D.La. Nov.1, 2001).

[40]*Abrams v. Baylor College of Medicine*, 805 F.2d 528, 532 (5th Cir.1986).

[41]*Waltman v. International Paper Co.*, 875 F.2d 468, 475 (5th Cir.1989).

[42]*See Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5 Cir.2003) (discrete acts are not entitled to the shelter of the continuing violation doctrine); *Huckabay v. Moore*, 142 F.3d 233 (5th

11

Application of Louisiana's "continuing tort" exception to prescription yields the same result. As aforestated, under the Louisiana Civil Code, a plaintiff must file his claim within one year from the date of injury or damage.[43] Under Louisiana law, there is an exception to this prescriptive period where the tortious conduct occurred on a continuing basis.[44] In *South Central Bell*, the Louisiana Supreme Court held:

> When the tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damage is abated ···· Where the cause of the injury is a continuous one giving rise to successive damages, prescription dates from the cessation of the wrongful conduct causing the damage.[45]

The Louisiana Supreme Court has applied the continuing tort theory to bar prescription of certain sex discrimination claims.[46] Plaintiff relies on *Bustamento* to support his argument that defendant's allegedly unlawful decisions not to assign him to the TSF program/temporary PTL in June of 2003 and to hire outsiders (Patton and Carrell) to fill supervisory positions in 2004 resulted in continuous discrimination/harassment on the basis of his race and national origin.

*Bustamento* does not address the factual situation involved in plaintiff's case. *Bustamento* involved a pattern of *sexual* harassment which gave rise to plaintiff's hostile environment claim. The court emphasized that in such cases the mere presence of the harasser may fuel a continuing

---

Cir.1998) (demotion and failure to promote actions were a different sort of conduct from the day-to-day harassment that made plaintiff's workplace hostile and therefore these otherwise untimely claims are not continuing violations).

[43]La.Civ.Code Ann. art. 3492.

[44]*South Central Bell Telephone v. Texaco, Inc.,* 418 So.2d 531, 533 (La. 1982).

[45]*Id.*

[46]*See Bustamento v. Tucker*, 607 So.2d 532, 536-40 (La.1992) (holding that the one-year prescriptive period does not commence until the last act of harassment occurred where incidents of harassment were continuous).

offensive work environment.  Summarizing the legal precepts applicable to the continuing tort theory,  the *Bustamento* court found that it is reserved to cases involving acts or conduct which are "continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature...."[47] Under such circumstances, prescription does not commence until the last act occurs or the conduct is abated.

By plaintiff's own account, the Aromatics Complex was not an offensive work environment and he got along well with all of his co-workers and supervisors in that unit and experienced no harassment on the basis of race and national origin.  It is undisputed that the offensive conduct abated and the last act occurred sometime in 1998  *i.e.*, prior to Mo's June, 2001 assignment to the Aromatics Complex.  As to the December 11, 2003 altercation with Charles Washington, plaintiff's own testimony leaves no room for speculation that race or national origin played any part in instigating the scuffle.   When questioned about Washington's occasional comment/remark ("troublemaker"), plaintiff testified that he did not know the reason and suggested that, perhaps, he (Washington)  was joking.[48]

## II. Prescription: State Law IIED

Mo's claim of intentional infliction of emotional distress brought under Louisiana Civil

---

[47]*Id.* at 542.

[48]*See* Sealed Deposition of Phillip Mo, Vol. II at p. 60.

Code article 2315 is subject to a one-year prescriptive period.[49]  This lawsuit was filed on November 15, 2004.  Therefore, with respect to events that occurred prior to November 14, 2003, plaintiff's state law claim is prescribed.   As previously explained, plaintiff's alleged denial of promotion in June of 2003 is a separate and distinct action which cannot be lumped together with the pattern of day-to-day harassment which abated prior to June of 2001.

The summary judgment record supports defendant's contention that plaintiff fails to meet his burden of proof with respect to his claim of IIED with respect to any conduct which occurred while he was assigned to the Aromatics Complex.   Although recognizing a cause of action for intentional infliction of emotional distress in a workplace setting, Louisiana's jurisprudence has limited the cause of action to cases which involve *a pattern of deliberate, repeated harassment* over a period of time.[50]   In *White*, the Louisiana Supreme Court stated:

> [In] order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.[51]

The plaintiff's burden of proof is high. Considering that the harassment/hostile environment abated once the plaintiff was reassigned in June of 2001 and that the conduct

---

[49]La. Civil Code article 3492.

[50]*Nicholas v. Allstate Insur. Co.*, 765 So.2d 1017, 1026-7 (La.2000)(*citing White v. Monsanto*, 585 So.2d 1205, 1210 (La.1991))(collecting cases).

[51]*White*, 585 So.2d at 1209.

complained of thereafter fails to approximate *a pattern of deliberate, repeated harassment* within the meaning of the applicable law, Mo's claim of intentional infliction of emotional distress necessarily fails. The first prong of the emotional distress test is whether the conduct of defendant was extreme and outrageous. It is well established that unlawful failure to promote without more is not outrageous enough to support a finding of intentional infliction of emotional distress. As to the December 11, 2003 fracas and suspension therefor, that too fails to approximate a pattern of deliberate and repeated harassment within the meaning of Louisiana law.[52]

### III.  Prima Facie Case: Title VII Failure to Promote

In this regard, Mo alleges that he was denied a promotion to supervisor in June or July of 2003 based upon his race and national origin.  The Court notes, at the outset, that any claim of failure to promote prior to April 16, 2003 is time barred because, as previously explained, said action occurred more than 300 days before plaintiff filed his February 10, 2004 EEOC charge. Moreover, any claim for denial of promotion after February 10, 2004 is not actionable since the plaintiff has failed to exhaust any such claim by filing an EEOC charge to address same.   The summary judgment record reveals that the only EEOC charge alleging discriminatory denial of promotion is Mo's February 10, 2004 charge.[53]

---

[52]*See Nicholas*, 765 So.2d at 1027 (La. 2000) and cases discussed therein.

[53]*See* Plaintiff's Deposition, Vol. I, at p. 41 and Exhibits 1, 3 and 3A (admitting that the only EEOC charges filed against ExxonMobil were (1) the February 10, 2004 Charge No. 270-2004-00814 alleging hostile environment on the basis of race/national origin and that he was passed over for promotion to temporary supervisor from sometime in 2000 until July of 2003 and (2) the April 30, 2004/May 5, 2004 Charge No. 270-2004-01558 alleging retaliation for filing the February 10, 2004 Charge position by refusing to allow Mo to return to work on a half-time basis later suspending him for two days upon his return to work on May 3, 2004 for scuffling with Charles Washington).

With respect to prescription of his pre-April 16, 2003 Title VII failure to promote claim and failure to exhaust any post-February 10, 2004 claim, plaintiff does not address the uncontroverted summary judgment evidence in this regard. Plaintiff solely focuses on Burke's June, 2003 decision and contends that claim is properly before this Court.

Defendant argues that summary judgment is proper because Burke's June, 2003 decision not to promote plaintiff to temporary PTL is not an "adverse employment action" within the meaning of Title VII.[54] Alternatively, ExxonMobil argues that Mo cannot demonstrate a *prima facie* case because he cannot show that he was qualified for the position. Additionally, defendant submits that the Kevin Burke made the decision based upon legitimate business reasons and that plaintiff cannot show that the reasons given were mere pretext/false or that plaintiff's race or national origin motivated Burke's decision.

It is not disputed that Burke "put out the word" at the Aromatics Complex that he was looking to assign an employee as a temporary Process Team Leader (PTL) and that Mo expressed interest in the assignment. It is also uncontroverted that, in June of 2003, Burke made the decision not to assign Mo to the Temporary Supervisor ("TSF") Program, which would have allowed him to temporarily perform the job of a Process Team Leader in the company's TSF program.[55]

Plaintiff argument is that "ExxonMobil's own submissions tend to prove discrimination" with respect to Kevin Burke's decision in June of 2003. Without citing to any evidence in the summary judgment record, plaintiff argues that Burke fails to deny that Mo was not given a

---

[54] *See Rios v. Rossotti,* 252 F.3d 375, 378 (5th Cir. 2001).

[55] *See* Burke Declaration at ¶¶ 7-10.

chance to prove himself as the temporary supervisor.  As to his qualifications, Mo argues:

> As described by Kevin Burke, the position was a temporary "PTL" to see if an individual was fit.  If so, he would receive the title "PTL."  How can one not be qualified to see if he was qualified?[56]

While plaintiff's argument may have some superficial appeal, the summary judgment

record evidence amply details why Burke believed that plaintiff was not qualified as a contender

for the TSF Program/temporary PTL in June of 2003 and thereafter.   Burke attests:

> In June of 2003, I made the decision not to place Mr. Mo in the TSF Program and assign him as a temporary PTL.  PTL stands for  Process Team Lead – the very title of the position shows that a candidate must be a team player.  The PTL job requires the PTL to interact regularly with the Field Supervisors, operators and stillpersons.  I had concerns for Mr. Mo's ability to work as a team player, his interpersonal skills, and his ability to interact appropriately with others.  For example:
> – In August of 2002, Mr. Mo was training (also known as "breaking in") on the Sulfolane unit.  There was an issue in which someone on the unit asked for Mr. Mo's assistance, and he refused assistance to that individual and the PTL.  I discussed that with Mr. Mo that he needed to be a team player and help his fellow employees when they needed it.
> – One night, Mr. Mo was held over on a night shift.  Ordinarily, if an employee is held over on night shift, the company buys breakfast for the employee.  Warren Waguespack, PTL, told Mr. Mo that he would buy him breakfast but it may take a little while because things were very busy on the unit.  Mr. Mo called me and said this was ridiculous, he was a diabetic and his blood sugar was dropping and all that he had was bread, and complained that the company was refusing to buy him breakfast.  I talked to Mr. Waguespack, and Mr. Waguespack told me that he told Mr. Mo that he was going to buy him breakfast as soon as he could.  Mr. Waguespack showed me the food order that he was going to call in for Mr. Mo.  Mr. Waguespack did not understand why Mr. Mo was acting this way.  In my opinion, Mr. Mo handled the situation badly.
> – On the Paraxylene 3 unit, samples are sent to the Lab for the No. 1 Crude and the No. 2 Crude units.  There was an incident on which Mr. Mo refused to run some special samples needed for the No. 1 Crude, and called me into the situation.  I looked into the matter.

---

[56]*See* Plaintiff's Memorandum in Opposition to Motion for Summary Judgment at p. 4.

Mr. Mo told me that he believed he should only have to run routine samples for No. 1 Crude, but he did not believe he should have to run special samples.  However, I learned that No. 1 Crude was very busy at the time and needed the assistance of Paraxylene 3 in running special samples.  I concluded that Paraxylene 3 was not pressed at the time and had the ability to assist No. 1 Crude with the special samples.

–       On various occasions, I witnessed Mr. Mo interrupting and talking over others, including myself.  An important aspect of the PTL position is to have good listening and interpersonal skills, so that he/she knows the issues and problems on the unit and can respond appropriately.

In addition, other managers did not support assigning Mr. Mo as a temporary PTL.  On June 25, 2003, I spoke with Mr. Mo about why I had decided that he was not going to be assigned to the TSF program and as a temporary PTL.

Because no one in the Aromatics Complex was suitable for the job, I thereafter sought recommendations outside of the Aromatics Complex.  Douglas Tillman (white), an employee in the Instrumentation and Electrical group was recommended by several management-level individuals, including Hollis Davis (PTL); Ray Green (PTL); Bill Alexander (Eng. Supervisor-worked with Tillman at another facility); Danny Delaup (Inst. and Elec. Supervisor - Tillman's immediate supervisor at the time).[57]

Regarding Tillman's qualifications for assignment to the TSF program as a temporary

PTL, the summary judgment record reflects that:

He began his employment with ExxonMobil on January 6, 2003 as an Electrician/Instrumentation employee in the Refinery's Mechanical Department.  His employment experience with previous employers included twelve years of experience as an electrician and six years in operations.  He previously worked at another petrochemical refinery in the Maintenance/Operations department.  Part of his duties included working a job very similar to the PTL position.  At that refinery, his operations duties included working as an operator in the Lube Oil Hydrotreater Unit ("LOHT") consisting of a hydrogen plant, 2800 lb. hydrogen compressor, a reactor and atmospheric and vacuum units; running sour water, an amine unit and a sulfur recovery unit; training on and running Honeywell TDC 2000 and 3000 boards for LOHT and occasionally moving up into the "A" job assuming all responsibilities of the unit.  Mr. Tillman's TDC, process and control instrumentation experience provided him with a good background for the PTL assignment.  Mr. Tillman performed well as temporary PTL, and on February 1,

_____

[57]Declaration of Burke at ¶¶ 10-11, Exh.A "Process Team Lead" Job Description.

2004, he was promoted to first-line supervisor as a PTL.[58]

As aforestated, under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination. An employee presents a *prima facie* case in a disparate treatment failure to promote case by showing that: (1) he belongs to a protected group, (2) he was qualified for the positions sought, (3) he did not receive the promotion, and (4) the position was not filled or the position was filled by someone outside the protected class.[59]

Plaintiff argues that the *McDonnell Douglas* framework is not applicable to his case because he has adduced evidence of direct discrimination.[60]  This Court disagrees.  There is not one scintilla of direct evidence of unlawful discrimination on the basis of race or national origin during the entire period that plaintiff was employed in the Aromatics Complex (*i.e.*, from June of 2001 through May of 2005).   It is uncontroverted that much of the plaintiff's work was performed on the Paraxylene 3 unit of the Aromatics Complex.  The Paraxyline 3 unit is separate and distinct from the other units in the Process Department.  It is part of a separate complex: the Aromatics Complex.

The Aromatics Complex is made up of operators, stillpersons, and PTLs who are not shared with the other units/complexes.  It is physically located in an area separate from the No. 3 Reformer Hydrocracker and No. 2 Coker units (about several hundred yards away from Hydrocracker and 1/4 mile from the No. 2 Coker).  The Paraxylene 3 unit shared an operator shelter with No. 2 Crude unit.  The shelter housed items such as the employees' lockers,

---

[58]*Id.* at ¶ 12.

[59]*Oden v. Oktibbeha County*, 246 F.3d 458, 468 (5th Cir.2001).

[60]*See* Plaintiff's Memorandum in Opposition at p. 6.

computers, and log books.  This operator shelter was not shared with the Hydrocracker or No. 2 Coker units.  After Mo's transfer to the Aromatics Complex, he no longer worked or had any reason to visit employees in the Hydrocracker or No. 2 Coker units.[61]   Moreover and as aforestated, Mo admittedly was not subjected to *any* unlawful harassment or discriminatory offensive behavior or utterances during the entire time that he was assigned to the Aromatic Complex.

Mo has failed to demonstrate a *prima facie* case because he has not produced any evidence that he was qualified for the management (PTL) position or assignment to the TSF program as a temporary PTL.   This is an essential element of his claim upon which plaintiff bears the burden of proof.   Thus plaintiff's only non-prescribed/actionable discriminatory failure to promote claim fails as a matter of law.

The Court notes that the summary judgment record does in fact contain some evidence about Mo's work experience at ExxonMobil.  Plaintiff  nonetheless fails to state a *prima facie* case of discrimination because he has not listed the eligibility, promotion and/or hiring criteria for the TSF Program, temporary PTL assignment or PTL position(s), nor has he shown that he satisfies each of the eligibility/promotional/hiring requirements.[62]   Mo's only evidence that he was qualified for the management position is his personal belief that, based upon his years as an operator, he was qualified for the assignment as temporary PTL in June of 2003.

To the extent plaintiff argues that he must be qualified because his former harassers in the Hydrocracker/Coker 2 units were eventually promoted to management level positions, this Court

---

[61]Declaration of Kevin Burke at ¶ 6.

[62]*See Burrell v. Crown Cent. Petroleum, Inc.*, 255 F. Supp .2d 591, 619 (E. D. Tex.2003).

is not convinced.  In his memorandum in opposition,  plaintiff identifies Barth/stillperson in 1994 (currently a process supervisor/PTL), LaBarre/operator in 1994 (currently stillperson/management), Neal stillperson/manager, Doerer/operator trainee in 1996 (currently Mechanical Supervisor), Simmons/relief operator/stillperson in 1996 (currently a supervisor processor), McCabe/stillperson in 1996 until retirement and Bowden/operator in 1996 (promoted to stillperson).  Plaintiff refers the court to Bowen's Sealed Declaration discussing Mo's harassment complaints back from 1994 through 1998, wherein Bowen details the company's investigations incidents that occurred in the Hydrocracker unit and documents the disciplinary, corrective and remedial actions taken in response to Mo's complaints.

Again, the Court reiterates that it is undisputed and Mo admitted that, once assigned to the Aromatics Complex, the harassment ended, he had no reason to interact with anyone in the Hydrocracker and Coker 2 units and that he did not.  Plaintiff testified that he related well to everyone in that unit, including Burke, and that he never heard Burke say anything derogatory about plaintiff's race or national origin.[63]  Plaintiff cannot create a genuine issue of fact simply by contradicting his own previous sworn statement without explaining the contradiction or attempting to resolve the disparity.[64]

Plaintiff's argument in this regard does not suffice to show pretext or discriminatory motive on the decision maker's/Burke's part.  Typically, "statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [do not] suffice to satisfy

---

[63]*See* Sealed Deposition of Phillip Mo, Vol. I, pp. 70, 97-98 and 100.

[64]*See e.g., Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806 (1999) (collecting cases); *Voisin v. Georgia Gulf Corp.,* 245 F. Supp. 2d 853, 858 (M. D. La. 2002).

the Plaintiff's burden."[65]   Statements of non-decision makers become relevant, however, when the ultimate decision maker's action is merely a "rubber stamp" for the subordinate's recommendation.[66]   Thus, "[i]f the employee can demonstrate that others had influence or leverage over the official decision maker ... it is proper to impute their discriminatory attitudes to the formal decisionmaker."[67]

Plaintiff has come forward with no evidence suggesting that Burke was either the "cat's paw" or merely a "rubber stamp" for the recommendations of plaintiff's former coworkers/supervisors in another unit.  Mo's conclusory argument  regarding the eventual promotion of his former harassers and speculation that they exerted influence over Burke's  post-April 16, 2003 decision not to assign plaintiff to the TSF program/temporary PTL is not sufficient for summary judgment purposes.   It is undisputed that  the decision at issue was Burke's and was predicated on Burke's own personal observation and assessment of Mo's job performance, actions and comportment  while assigned to the Aromatics Complex.


Plaintiff's honest belief in his own qualifications does not raise a material issue concerning whether he was qualified for the position of temporary PTL or participation in the TSF program.[68]  The Court recognizes that "the 'fact that [the plaintiff's] case-in-chief consists solely of [his] own

---

[65]*Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring).

[66]*Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226-27 (5th Cir.2001).

[67]*Id.* at 226; *see also Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir.1997) ("[T]here can be situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate.").

[68]*See Patrick v. Principi,* 275 F.3d 44, 46 (5th Cir. 2001).

22

testimony does not prevent [him] from establishing intentional discrimination.' "[69]   However, a plaintiff's testimony regarding his opinion of his qualifications and work performance cannot be speculative or conclusory.[70]   Generally, mere acceptance of an employee's favorable assessment of his own qualifications cannot permit a fact finder to conclude that an employer's reasons for a challenged employment action are pretextual, absent the presence of other evidence tending to demonstrate discriminatory intent.[71]

Assuming *arguendo* that plaintiff has demonstrated a *prima face* case of discriminatory failure to promote, plaintiff's case fails for lack of evidence of pretext or discriminatory motive. "The ultimate question in every employment discrimination case ... is whether the plaintiff was the victim of intentional discrimination."[72]   The only substantial evidence presented by plaintiff is proof of disparaging, discriminatory and  insensitive remarks and conduct by coworkers/supervisors in the Hydrocracker/Coker 2 units, all of which occurred and was remediated prior to plaintiff's assignment to the Aromatics Complex in mid-2001.  None of these remarks, however, are attributed to Burke, the decisionmaker with authority to promote in 2003/2004.   No evidence suggests that plaintiff's former harassers in Hydrocracker exerted

---

[69]*See Evans v. City of Bishop*, 238 F.3d 586, 590 n. 7 (5th Cir.2000) (*citing Portis v. First Nat'l Bank*, 34 F.3d 325, 329 n. 10 (5th Cir.1994)).

[70]*Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir.1996) ("To establish a fact question as to relative qualifications, a plaintiff must provide sufficiently specific reasons for his opinion; mere subjective speculation will not suffice.").

[71]*See e. g., Boehms v. Crowell*, 139 F.3d 452, 459 (5th Cir.1998).

[72]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

influence over Burke or his decision in June or July of 2003.[73]   Plaintiff  has failed to create a genuine issue of material fact that Burke's proffered reasons were a pretext for discrimination.[74]

Mo has failed to present evidence raising an inference of racial and national origin discrimination.  Concomitantly, he has failed to adduce evidence such that a reasonable fact finder could conclude that ExxonMobil's proffered reasons were false and that the decision was motivated by discriminatory *animus*.[75]  Accordingly, summary judgment dismissing plaintiff's Title VII discriminatory failure to promote claims is warranted.

### IV. Title VII Retaliation

Plaintiff argues that ExxonMobil's failure to comply with his request and return him to work on a reduced schedule on April 5, 2004 constitutes unlawful retaliation against him for filing EEOC  charges.  A charge of retaliation follows a burden-shifting analysis similar to employment discrimination.[76]  Hence, once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Then, plaintiff must produce sufficient evidence demonstrating that the proffered reason was a pretext for retaliation.   Ultimately, plaintiff must

---

[73]*See Russell*, 235 F.3d at 227 (stating that "it is appropriate to tag the employer with an employee's [discriminatory] animus if the evidence indicates that the worker possessed leverage, or exerted influence, over the titular decisionmaker").

[74]*See Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 903 (5th Cir.2000) (discussing the evidentiary burden).

[75]*See Bauer v. Albemarle Corp.,* 169 F.3d 962, 967 (5th Cir. 1999) ("Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false;....  [A]n employees 'subjective belief of discrimination' alone is not sufficient to warrant judicial relief.").

[76]*See Rios*, 252 F.3d at 380 (*citing Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir.1998)).

demonstrate that the adverse employment would not have occurred "but for" the protected

activity.  To establish a *prima facie* case of unlawful retaliation under Title VII , Mo must

demonstrate that (1) he engaged in activity protected by Title VII ; (2) an adverse employment

action occurred; and (3) a causal link existed between participation in the protected activity and

the adverse employment action.[77]

Mo's retaliation claims derive from  EEOC Charge No. 270-2004-01558 as amended,

which states that: (1) his March 22, 2004 request to return to work on April 5, 2004 on a reduced

schedule was denied and/or his return to work on a reduced schedule was delayed in retaliation

for filing EEOC Charge No. 270-2004-0814 on February 10, 2004; and (2) upon his return to

work on May 3, 2004, a two-day suspension was imposed for scuffling with Charles Washington

in retaliation for his February 10, 2004 EEOC activity *i.e*., Charge No. 270-2004-0814.[78]  In

addition to the two retaliation claims which comprise his second EEOC charge as amended,

plaintiff now  alleges or complains of  *retaliatory* coworker harassment.

### A. *Retaliatory* Co-worker Harassment

Plaintiff alleges that co-worker Charles Washington, with whom he scuffled on December

11, 2003, called him "troublemaker."[79]  To the extent that plaintiff now attempts to allege

---

[77]*See Webb v. Cardiothoracic Surgery Associates of North Texas, P.A.*, 139 F.3d 532, 540 (5th Cir.1998).

[78]*See* EEOC Charge No. 270-2004-01558 filed April 30, 2004 (alleging retaliation for filing the February 10, 2004 EEOC Charge position by refusing to allow Mo to return to work on a half-time basis); Amended EEOC Charge No. 270-2004-01558 filed  May 5, 2004 (alleging that the suspension upon his return to work on May 3, 2004 for scuffling with Charles Washington constituted retaliation for filing the February 10, 2004 EEOC Charge) [Exhibits "3" and "3A" to Mo's Sealed Deposition].

[79]*See* Sealed Deposition of Phillip Mo taken February 23, 2006, Vol. II at p. 60 (stating that Charlie Washington called him "troublemaker, [m]aybe jokingly");  Declaration of Charles

retaliatory harassment by co-workers in the Hydrocracker/Coker units, plaintiff's claims of retaliatory co-worker harassment are prescribed for reasons previously explained.   Addressing plaintiff's complaint regarding Charles Washington's alleged remark  ( "troublemaker"),  plaintiff fails to identify any adverse employment consequence <u>and</u> any knowledge on Washington's part regarding either his first or second EEOC charge.  It is undisputed that Washington worked in the Aromatics Complex and that mid-2001 was the first time Washington worked in the same complex as the plaintiff.[80]

It is further undisputed that both Mo and Washington were union-represented and covered by the collective bargaining agreement between their employer and the union.  Both worked an hourly wage rate at hours commensurate with other non-supervisory employees.  It is further uncontroverted that Washington did not have the authority to hire, fire, make compensation or assignment decisions, authorize overtime, make promotion/demotion decisions, or to discipline.[81]

Clearly, Washington's remark does not amount to direct evidence of either discriminatory or retaliatory motivation.  Plaintiff fails to demonstrate a *prima facie* case of retaliatory co-worker harassment.  There is a complete failure of proof with respect to an adverse employment decision/event and with respect to causation.  Moreover and as explained below, plaintiff  failed to exhaust his administrative remedies with respect to his claims of *retaliatory* co-worker

---

Washington dated March 6, 2006 (stating that he never called Mr. Mo derogatory names of a racial or national origin nature, never harassed or taken any actions regarding Mr. Mo because of his race or national origin and had not seen or heard anyone else make such comments or harass Mr. Mo).

[80]*See* Declaration of Charles Washington at ¶ 3 [Doc. No. 52-12]; Sealed Deposition of Phillip Mo, Vol. II, at p. 11 (stating that "no," that he had not worked with Washington before coming to the Aromatics Complex).

[81]*See* Declaration of Shauna J. Seals at ¶ 5.

harassment and he cannot now do so.

Before filing a Title VII claim, a plaintiff must first exhaust his administrative remedies by filing a complaint with the EEOC. "The scope of a Title VII complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."[82] "A plaintiff may not circumvent the EEOC filing requirements by raising only a few claims in [his] EEOC filings, and later suing over every claim arising out [his] employment."[83]

In this case, plaintiff's retaliation claim as amended [EEOC Charge No. 270-2004-01558] involved two distinct employment decisions/events, to wit: (1) the decision to impose a two-day suspension for scuffling with Charles Washington; and (2) the denial of Mo's request to return to work on April 5, 2004 on a reduced schedule. There is no hint of a claim of *retaliatory* coworker harassment set forth in plaintiff's charge. Accordingly, any such claim of *retaliatory* coworker harassment has not been exhausted, is not actionable and must be dismissed. The Court notes that plaintiff's memorandum in opposition does not address the defendant's motion insofar as it seeks dismissal of his claims of *retaliatory* coworker harassment on the basis of failure to exhaust such claims.

**B. Alleged  Retaliatory Decision to Impose a Two-Day Suspension.**

The Court now turns to defendant's contention that the plaintiff cannot demonstrate a *prima facie* case of retaliatory suspension. As previously noted above, a charge of retaliation follows the *McDonnell Douglas* burden-shifting analysis and thus plaintiff must establish a *prima*

---

[82]*Thomas v. Tex. Dep't of Criminal Justice,* 220 F.3d 389, 395 (5th Cir. 2000).

[83]*Aucoin v. Kennedy,* 355 F. Supp. 2d 830, 840 (E. D. La. 2004).

*facie* case by demonstrating that (1) he engaged in activity protected by Title VII ; (2) an adverse employment action occurred; and (3) a causal link existed between participation in the protected activity and the adverse employment action.[84]

Once the plaintiff establishes his *prima facie* case, the defendant has the burden of production to articulate a legitimate nondiscriminatory reason for the adverse employment action. If the defendant meets this burden, the ultimate question becomes whether  "'but for' the protected activity, the [adverse employment action] would not have occurred, notwithstanding the other reasons advanced by the defendant."[85]   The requirement of showing "but for" causation is more stringent than the minimal causation required to make the plaintiff's *prima facie* case.[86]


Not all of the elements of the *McDonnell Douglas* analysis are at issue – *i.e.*,  ExxonMobil does not dispute that Mo engaged in protected activity when he filed EEOC charges.  The thrust of defendant's motion is that the protected activity did not motivate the employment decisions at issue.  Defendant also focuses on plaintiff's failure of proof with respect to the causal relationship between the December, 2003 decision to suspend Mo and his 2004 EEOC activity.  Defendant further argues that plaintiff has failed to identify an adverse employment decision as most recently defined by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*, 2006 WL 1698953 (June 22, 2006).

---

[84]*See Webb v. Cardiothoracic Surgery Associates of North Texas, P.A.*, 139 F.3d 532, 540 (5th Cir.1998).

[85]*Vadie v. Mississippi State University*, 218 F.3d 365, 374 (5th Cir.2000) (*quoting McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir.1983), *cert. denied*, 531 U.S. 1113 (2001)).

[86]*Hall v. Pitney Bowes, Inc.*, 2004 WL 389093, at *10 (N. D. Tex., Feb.27, 2004).

To the extent that plaintiff suggests that he was singled out, plaintiff's argument is unfounded.  It is uncontroverted that the decision was made in December of 2003 to suspend both offenders (Mo and Washington) for the workplace fracas.  As to plaintiff's deposition testimony regarding supervisors in another unit not being disciplined for fighting in the workplace, in the absence of proof that he was "similarly situated," plaintiff cannot show disparate treatment with respect to the imposition of discipline.

With respect to retaliatory discipline, proof of causation is absent.  The Court recognizes that plaintiff's burden at the *prima facie* stage is not onerous; however, he must produce at least some evidence that the decision makers had knowledge of his protected activity.[87]   As the Fifth Circuit held in *Manning*:  "If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity."[88]

Plaintiff has failed to address the defendant's motion for summary judgment insofar as it seeks dismissal of the "retaliatory suspension" claim.   Because plaintiff cannot establish that a causal link existed between his participation in February/April 2004 protected activity and the earlier (December, 2003) employment decision[89] to suspend him, plaintiff's retaliation claim must

---

[87]*Manning v. Chevron Chem. Co. LLC*, 332 F.3d 874, 883 n. 6 (5th Cir.2003) (*citing Medina v. Ramsey Steel Co., Inc*., 238 F.3d 674, at 684 (5th Cir.2001)).

[88]*Id.* at 883, n. 6. *See also Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir.1999)( "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." ); *Reed v. Efficient Networks, Inc*., 2004 WL 1717369 (N. D. Tex. July 30, 2004)(granting summary judgment on a retaliation claim where plaintiff offered no evidence that decision maker knew of protected activity).

[89]*See* Declaration of Senior Human Resources Advisor Curtis Fullard dated February 3, 2006, ¶¶ 3 and 5 (stating that he made the decision to suspend Mo for two days without pay in

fail in this regard.  Under the circumstances (*i.e.*, EEOC activity post-dating the adverse employment decision), no reasonable trier of fact could find that the decision to suspend the plaintiff for fighting in the workplace was retaliatory.

### C. Alleged Retaliatory Delay of Plaintiff's Return to Work on a Reduced-Shift

Plaintiff's retaliation claim involves a twenty-seven (27) day delay in allowing him to return to work on a reduced-shift schedule.  Plaintiff requested that he be returned to his work in the Aromatics Complex on April 5, 2004, but on a reduced-shift basis per his physician's statement.  On May 3, 2004, plaintiff returned to work on a reduced schedule.  Again, defendant submits that plaintiff fails to demonstrate a *prima facie* case of retaliation.

It is undisputed that Mo took disability leave in December of 2003 and did not seek to return to the workplace until April 5, 2004 and then only on a reduced schedule per his physician's statement .  *Via* consultation report dated March 22, 2004, plaintiff's physician Dr. Mestayer so informed Exxon Mobil, further stating that, if after a month all goes well, Mo could then return to work on a  full time basis.[90]  It is undisputed that the both Burke and Seals considered Mo's request for reduced hour shifts.[91]   Burke's concerns were as follows:  (1) whether his department had a specific need for reduced-hour shift work that could not be met through the department's full-shift organization;  (2) whether Mo could return to work under the schedule proposed by his physician;  (3) whether a reduced-hour shift for Mo would work

---

December of 2003 at which time he was not aware that Mo had filed or intended to file an EEOC charge).

[90]*See* Sealed Deposition of Phillip Mo, Vol. II at pp. 63-64.

[91]*See* EEOC Charge No. 270-2004-01558 (Exh. Mo 3 to Sealed Deposition of Mo); Sealed Deposition of Phillip Mo, Vol. II, p. 67; Declaration of Shauna Seals at ¶¶23-26; *See* Declaration of Kevin Burke at ¶¶ 28-30.

hardships on other employees who would be required to work 18-hour shifts or Burke would have to find someone else to serve as relief for the remaining 6 hours on Mo's shift; and (4) upon his return, how Mo would respond to the two-day suspension in accordance with the company's December, 2003 decision.[92]

It is undisputed that, on April 28, 2004, the company decided that Mo could return on a reduced schedule for two weeks and then full twelve hour shifts thereafter as suggested by ExxonMobil's onsite medical department.[93]  On April 30, 2004, Mo was apprised of the decision telephonically.[94]  That same day (April 30, 2004 at 12:43 P.M.), plaintiff filed his original retaliation charge (No.270-2004-01558), alleging retaliation for his February 10, 2004 EEOC Charge by refusing to allow him to return to work on a reduced-shift basis.[95]  Mo returned to work on May 3, 2004, when he was notified of the two-day suspension.  Thereafter, he worked a reduced schedule for two weeks and, once released to full time work on May 26, 2004, he resumed his regular 12-hour shift.[96]

ExxonMobil submits that the delay in his return to work from April 5, 2004 to May 3, 2004 does not rise to the level of adverse employment decision, since he was paid his full salary and received benefits during this period pursuant to ExxonMobil's disability plan.  Defendant

---

[92]*See* Declaration of Kevin Burke at ¶ 29;  Declaration of Shauna Seals at ¶24.

[93]*See* Declaration of Kevin Burke at ¶ 30 and Exh. "D";  Declaration of Shauna Seals at ¶26.

[94]*See* Declaration of Kevin Burke at ¶ 30;  Declaration of Shauna Seals at ¶26.

[95]Plaintiff's testimony that he had to file retaliation charges before he was allowed to return on a part-time basis.

[96]*See* Declaration of Kevin Burke at ¶ 30;  Declaration of Shauna Seals at ¶26.

also argues that such a slight delay in his actual return to work without monetary loss cannot be considered retaliation, because plaintiff has come forward with no evidence suggesting that the company's decision was motivated by any EEOC filing.   In this regard, defendant notes that the only EEOC decision pending at the time was the February 10, 2004 charge.  Defendant highlights that Mo has admitted that both Burke and Shauna Seals informed him that he could return to work immediately (*i.e.*, the next day) if his physician released him to a full-time schedule.[97]  Defendant points out that the record is uncontroverted that, once Burke secured work for Mo to perform on a reduced schedule that would not be disruptive of the unit and ExxonMobil's medical department determined that he was capable of work on a reduced schedule, Mo was informed of that schedule.

Apparently attempting to create an issue of fact as to whether ExxonMobil's proffered reasons for the 27-day delay in returning him to work were a pretext, plaintiff *argued* that it was only after he filed his second charge with the EEOC *on April 28, 2004* that he was allowed to return to work.[98]   In this same vein, plaintiff testified that:

> "I went to the EEOC and filed charges.... But I filed charges that this is retaliation. And then the very next day, everything has been fixed.  The doctor is okay, everything is okay."[99]

---

[97] *See* Sealed Deposition of Phillip Mo, Vol. II , at p. 67; *See also* Plaintiff's EEOC Charge No. 270-2004-01558 (noting that Burke told plaintiff that if his doctor released him to full duty, he would be on the schedule the following week).

[98] *See* Plaintiff's Memorandum in Opposition at pp. 8-9 (arguing that "[t]he date of his return to work [May , 3, 2004] just happens to be right after Mr. Mo filed his second discrimination suit, April 28, 2004, with the EEOC complaining that he was not allowed to return to work" and insinuating that his second EEOC charge prompted the company's decision to allow him return).

[99] Sealed Deposition of Phillip Mo, Vol. II, at p. 66.

The undisputed facts comprising the summary judgment record do not support plaintiff's argument/speculation.  More specifically, it is undisputed that: (1) on April 28, 2004, ExxonMobil made its decision to allow plaintiff to return on a reduced schedule;[100]  (2) thereafter, on April 30, 2004, Seals and Burke left a telephone message for Mo apprising him of the decision to allow him to return to work and informing him of his reduced schedule;[101]  and (3) Mo's second EEOC charge was dated, signed and filed by him on April 30, 2004 – *i.e.*, two days after the company's decision to allow his return to work and the same date that Mo was informed of his reduced schedule by telephone.  Therefore, the filing of his second EEOC charge (alleging retaliation/disability discrimination by failing to accommodate his request for a reduced schedule) could not have prompted the company's decision to allow Mo to return to work on a reduced schedule.

As further "evidence" of pretext, plaintiff argues that "ExxonMobil ... returned numerous other employees to work on reduced schedules on a timely basis."[102]  Plaintiff's argument in this regard is unsubstantiated, unspecific and vague in all respects.   Mo does not identify the workers who were allegedly permitted to return on a reduced schedule nor, does he indicate whether these unspecified individuals were shift workers or not.  Plaintiff fails to identify the supervisor who accommodated the unspecified other workers' immediate return to work on a reduced-shift basis.

---

[100]*See* Declaration of Seals at ¶ 26 (attesting that Seals received notification of company's *April 28, 2004* decision to allow Mo's return to work on a reduced schedule and that, by telephone message on April 30, 2004,  she and Burke informed Mo of this schedule); and ExxonMobil Medicine Department Form 315 dated **4-28-04** (noting that Mo was released to work on a reduced schedule)[ Exh. "E" to Seals' Declaration] .

[101]*See* Declaration of Seals at ¶ 26.

[102]*See* Plaintiff's Memorandum in Opposition at p. 8.

Plaintiff  also fails to define what he considers to be "a timely basis," notwithstanding his assertion that "the real issue [in]volves return[ing] Mr. Mo to work on a timely basis."[103]   This Court is left to speculate.  In this Court's opinion, plaintiff presents no probative theory of either pretext or disparate treatment[104] with respect to the brief delay (less than a month) in returning Mo to work on a reduced schedule.  Most notably, plaintiff testified that he received his full pay during the entire period (April 5, 2004 to May 3, 2004).

Whether summary judgment is appropriate depends on numerous factors, including "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered."[105]   Assuming without deciding that the plaintiff has established a *prima facie* case (*i.e.*, that the 27-day delay in allowing plaintiff to return to work on a reduced schedule rises to the level of an adverse employment action within the meaning of the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, *supra*), the plaintiff's *prima facie* case registers on the weakest end of the spectrum.  As explained below, competent summary judgment evidence of pretext and/or retaliatory motive are completely absent.

Plaintiff does not and cannot now demonstrate that "but for" his protected activity he would have been placed back to work on April 5, 2004 on a reduced shift basis.  Plaintiff

---

[103]*Id.*

[104]*See Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir.1998) (vague allegations of discrimination are insufficient to survive summary judgment).

[105]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-19 (2000) (enunciating the standard applicable to judgment as a matter of law); *see also Pratt v. City of Houston*, 247 F.3d 601, 607 n. 3 (5th Cir.2001) (noting that the standard applicable to JMOL and summary judgment are the same).

admitted that both Seals and Burke stated that he could return immediately to work if his physician released him to full shift work.  Clearly, plaintiff's medical condition, the working environment and the fact that plaintiff was a shift worker figured prominently in the delay in allowing his return to work on a reduced basis.   Considered in total, plaintiff's evidence does not refute the proffered reasons for the delay and plaintiff fails to otherwise demonstrate that unlawful retaliation motivated the delay in allowing plaintiff's return to the workplace.  In summary, on this record plaintiff cannot carry his ultimate burden of demonstrating that "but for" his protected activity, his return to work on a reduced shift basis would not have been delayed.

Because summary judgment is warranted dismissing all of the plaintiff's claims (Title VII employment discrimination/retaliation and state law IIED), plaintiff's Title VII claim for punitive damages necessarily fails.   Accordingly,

**IT IS ORDERED** that Exxon Mobil Corporation's Motion for Summary Judgment [Doc. No. 52], seeking dismissal of the plaintiff's case in its entirety is GRANTED.

**IT IS FURTHER ORDERED** that Exxon Mobil Corporation's Motion in Limine [Doc. # 60] is DISMISSED AS MOOT.

New Orleans, Louisiana, this 1st day of August, 2006.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**